No. 24-30772

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BURNEAL ELLIOTT,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CR-88-1

_____

**BRIEF FOR APPELLANT**

_____

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

CELIA C. RHOADS
Assistant Federal Public Defender

Office of the Federal Public Defender
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
Celia_Rhoads@fd.org

## CERTIFICATE OF INTERESTED PERSONS

*United States v. Burneal Elliott*
No. 24-30772

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  *Defendant-Appellant:* Burneal Elliott.

2.  *Counsel for Defendant-Appellant*: Assistant Federal Public Defender Celia C. Rhoads.

3.  *Former Counsel for Defendant-Appellant*: Sara A. Johnson, Tanzanika Q. Ruffin, and former Assistant Federal Public Defender Jerrod Edward Thompson-Hicks.

4.  *Counsel for Plaintiff-Appellee*: Assistant United States Attorneys Kevin G. Boitmann and Megan Roberts.

5.  *Former Counsel for Plaintiff-Appellee*: Assistant United States Attorneys Michael Eston Trummel, Sarah Dawkins, and Alexandra Triana Giavotella.

s/Celia Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender
Dated: July 11, 2025

ii

## REQUEST FOR ORAL ARGUMENT

Appellant Burneal Elliott respectfully requests oral argument. This appeal presents numerous constitutional and other errors related to the validly of Mr. Elliott's convictions and 15-year sentence. The questions presented are numerous and both factually and legally intensive. Therefore Mr. Elliott respectfully urges that oral argument would assist this Court in resolution of his appeal.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ..........................................ii

REQUEST FOR ORAL ARGUMENT................................................... iii

TABLE OF CONTENTS ...............................................................iv

TABLE OF AUTHORITIES............................................................ 1

STATEMENT OF JURISDICTION.....................................................3

STATEMENT OF THE ISSUES.........................................................4

STATEMENT OF THE CASE .........................................................5

SUMMARY OF THE ARGUMENT .......................................................21

ARGUMENT .........................................................................22

    I.    Mr. Elliott's firearm convictions under 18 U.S.C. § 922(g) and (o) are unconstitutional and must be reversed. ........................................................22

        A.    Standard of Review. ...............................................22

        B.    18 U.S.C. § 922(g)(1) is unconstitutional as applied to Mr. Elliott, whose only prior felony is a simple narcotics possession. .....................................24

            1.    The *Bruen*/*Diaz* Framework. .............................24

            2.    The district court's ruling below was erroneous (clearly and obviously so), because it ignored the *Bruen* framework and instead simply relied on now-invalidated precent. .....................................32

            3.    Section 922(g)(1) is unconstitutional as applied to Mr. Elliott—clearly and obviously so. ................33

C.    In the alternative, § 922(g)(1) is unconstitutionally vague. ................................................................. 37

D.    18 U.S.C. § 922(o) is unconstitutional under *Bruen*—both on its face and as applied to Mr. Elliott. ................................................................ 45

E.    Although preserved, these errors also satisfy the requirements of plain-error review ........................... 50

F.    In light of *Bruen*, § 922(g)(1) is unconstitutional on its face and exceeds Congress's authority under the Commerce Clause [Foreclosed] ............................ 51

II.    The district court erred in its application of U.S.S.G. § 2K2.1(b)(1)(B). ............................................................ 59

A.    Legal Framework and Standard of Review. ................. 59

B.    The district court erred in its findings as to both the number of firearms involved and when those firearms were actually possessed. .............................. 61

C.    The district court erred in its findings that all past, wholly unrelated firearm possessions qualified as relevant conduct to the March 17 drug offense. .......... 63

CONCLUSION ................................................................................. 65

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES**

*Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336 (3d Cir. 2016) ............................................................................................38

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ....................................44

*Colautti v. Franklin*, 439 U.S. 379 (1979) ............................................39

*Dist. of Columbia v. Heller,* 554 U.S. 570 (2008) ..................................24

*Drummond v. Robinson*, 9 F.4th 217 (3d Cir. 2021) .............................28

*Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464 (2020) ................34

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ................................. passim

*Industrial Union Dept., AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980) ..................................................................................56

*Johnson v. United States*, 576 U.S. 591 (2015) ...............................ii, 39

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ........................................48

*Kolender v. Lawson*, 461 U.S. 352 (1983) .............................................39

*Lanzetta v. New Jersey*, 306 U.S. 451 (1939) ........................................42

McDonald v. City of Chicago, 561 U.S. 742 (2010) .................................25

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ...................56

*Percoco v. United States*, 598 U.S. 319 (2023) ......................................43

*Puckett v. United States*, 556 U.S. 129 (2009) ......................................23

*Range v. Att'y Gen. United States of Am.,* 69 F.4th 96 (3d Cir. 2023)....38

*Scarborough v. United States*, 431 U.S. 563 (1977).............. 54, 55, 57, 58

*Skilling v. United States*, 561 U.S. 358 (2010) ......................................44

*United States v. Alcantar*, 733 F.3d 143 (5th Cir. 2013) .......................55

*United States v. Brummett*, 355 F.3d 343 (5th Cir. 2003).....................64

*United States v. Byrd*, 898 F.2d 450 (5th Cir. 1990) ............................60

*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024)............... passim

*United States v. Copeland*, 820 F.3d 809 (5th Cir. 2016) ......................22

*United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003) ...................28

*United States v. Davis*, 588 U.S. 445 (2019) ................................... 40, 43

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001) .......................28

*United States v. Hernandez-Montes*, 831 F.3d 284 (5th Cir. 2016)........23

*United States v. Hill*, 927 F.3d 188 (4th Cir. 2019) ..............................55

*United States v. Kimble*, No. 23-50874, 2025 WL 1793832 (5th Cir. June 30, 2025) .................................................................... 33, 36, 37

*United States v. Lopez*, 514 U.S. 549 (1995) ............................. 54, 55, 58

*United States v. Moored*, 997 F.2d 139 (6th Cir. 1993) ..........................61
*United States v. Morrison*, 529 U.S. 598 (2000) ....................................58
*United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29 (1963)...............39
*United States v. Rahimi*, 602 U.S. 680 (2024) ........................... 11, 48, 49
*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023).................... passim
*United States v. Reese*, 92 U.S. 214 (1875) .......................... 40, 41, 43, 44
*United States v. Seekins*, No. 21-10556, 2022 WL 3644185 (5th Cir. Aug. 24, 2022).................................................................................54
*United States v. Stevenson*, 126 F.3d 662 (5th Cir. 1997) ......................61
*United States v. Toure*, 965 F.3d 393 (5th Cir. 2020) ............................22
*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024) ............... 38, 42
*Winters v. New York*, 333 U.S. 507 (1948) ............................................42

## STATUTES

18 U.S.C. § 922 ........................................................................................4
18 U.S.C. § 924 ..................................................................................6, 19
21 U.S.C. § 841 ........................................................................................6

## OTHER AUTHORITIES

Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) .............................................................................................53

## STATEMENT OF JURISDICTION

This appeal is from the final judgment in a criminal case. The district court had original jurisdiction under 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court entered its judgment on December 9, 2024, and amended judgment on December 10, 2024. ROA.474, 485. Mr. Elliott timely filed a notice of appeal on December 12, 2024. ROA.493.

## STATEMENT OF THE ISSUES

(1)    Whether 18 U.S.C. § 922(g)(1) is unconstitutional as applied to Mr. Elliott, whose sole felony conviction is for simple cocaine possession.

(2)    Whether § 922(g)(1) is unconstitutionally vague.

(3)    Whether 18 U.S.C. § 922(o) is unconstitutional in light of *Bruen*—both on its face and as applied to Mr. Elliott.

(4)    Whether § 922(g) is unconstitutional on its face [Foreclosed].

(5)    Whether 18 U.S.C. § 922(g)(1) exceeds the scope of Congress's power to regulate interstate and foreign commerce [Foreclosed].

(6)    Whether the district court erred by applying U.S.S.G. § 2K2.1(b)(1)(B)—the four-point enhancement applicable if "the offense involved" eight to twenty-four firearms.

## STATEMENT OF THE CASE

*State Arrest and Federal Charges.*

On March 17, 2021, Jefferson Parish officers observed what they believed to be a hand-to-hand narcotics transaction in the parking lot of an apartment complex. ROA.230. Officers apprehended Appellant Burneal Elliott at the scene and recovered 3.5 grams of marijuana and 2.44 grams of crack cocaine. ROA.231. Mr. Elliott was driving a Nissan at the time of the offense, and, although there had been a passenger in the car as well, the passenger fled and evaded capture. ROA.436.

Upon searching that car, officers located a Glock pistol in the front driver's seat where Mr. Elliott had been seated. ROA.231. In the back passenger seat, officers separately found a Smith & Wesson. ROA.783. Attached to the Glock pistol was a so-called "Glock switch"—a small device that can be attached to the rear of the slide of a handgun, changing a semi-automatic pistol into a selective fire machine pistol capable of fully automatic fire. ROA.231. Law enforcement later determined that Mr. Elliott had a single prior felony conviction: 2018 conviction for simple possession of cocaine for which he received a suspended sentence. ROA.253, 264, 437.

Federal prosecutors ultimately adopted the case and charged Mr. Elliott in a four-count indictment:

> **Count 1**: Possession of a firearm (specifically, the Glock) after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1);
>
> **Count 2**: Possession of a machine gun, in violation of 18 U.S.C. § 922(o);
>
> **Count 3**: Possession with intent to distribute a quantity of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and
>
> **Count 4:** Possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

ROA.18-19.

On April 11, 2023, Mr. Elliott pleaded guilty to all four counts. ROA.250. In his factual basis, he admitted to possession of the Glock and the narcotics and further admitted that "the firearm was kept on his person to protect the drugs he intended to sell." ROA.233.

*Presentence Proceedings and Litigation.*

Initially, U.S. Probation calculated Mr. Elliott's Sentencing Guidelines range as 24 to 30 months for Counts 1 through 3—a term that was required to run consecutively to the five-year mandatory minimum for Count 4. ROA.260. Thus, U.S. Probation determined that Mr. Elliott's aggregate recommended term of imprisonment was 84 to 90 months.

ROA.771. The government did not object to any portion of the PSR and noted its agreement with those Guidelines in a Sentencing Memorandum. ROA.776, 849.

Following issuance of the final PSR, Mr. Elliott's attorney moved to withdraw, and new counsel enrolled. ROA.278. Mr. Elliott's new counsel requested a continuance to review the case, which the district court granted. ROA.283, 285. Following that review, counsel filed a motion to dismiss Counts 1 and 2—the § 922(g)(1) felon-in-possession count and the § 922(o) machine gun count—on constitutional grounds. ROA.287. The fifteen-page memorandum in support was detailed and cited extensively to supporting legal authority. ROA.289-303. Counsel acknowledged that the motion was filed post-plea but urged that Mr. Elliott's convictions as to those two counts were unconstitutional under rapidly developing Second Amendment caselaw that followed the Supreme Court's landmark decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Counsel noted her "obligation to raise all defects in the proceedings," including constitutional infirmities. ROA.289.

With respect to Count 1 (the felon-in-possession charge), counsel

urged that—following the Supreme Court's decision in *Bruen*—
§ 922(g)(1) is unconstitutional under the Second Amendment as applied
to Mr. Elliott. ROA.287, 290-300. As counsel noted, *Bruen* now placed the
burden on the government to "point to historical precedent from before,
during, and even after the founding [that] evinces a comparable tradition
of regulation" when defending a particular firearm restriction against
Second Amendment challenge. ROA.291 (quoting *United States v.
Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023)). Using that specific historical
evidence, the government is now required "to demonstrate that" the
Second Amendment infringement at issue "fits within our Nation's
historical tradition of firearms regulation." *Id.* Counsel urged that
Mr. Elliott's only conviction was for simple possession of cocaine, thus
placing the burden on the government "to show that disarming those with
similar, nonviolent felony records is consistent with the Nation's
historical traditions." ROA. 298. Counsel urged that there was no such
historical precedent to make that showing. ROA.298.

Alternatively, counsel argued that § 922(g)(1) is now
unconstitutionally vague, due to the post-*Bruen* piecemeal approach that
courts have taken in assessing the statute's constitutionality. In

8

particular, courts have avoided striking down the law in its entirety by simply determining it applies to some felons, but not others. As counsel observed, it was now impossible for defendants like Mr. Elliott to know whether they do or do not fit within the "amorphous and undefined subset" of those felons prohibited from exercising their Second Amendment Rights. ROA.299-300.[1]

With respect to Count 2 (the machine gun charge), counsel asserted the same Second Amendment claims, arguing that *Bruen* abrogated prior Fifth Circuit caselaw previously holding that machine guns are not entitled to Second Amendment protection. ROA.300 (citing *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016)).

After filing the motion, counsel requested that Mr. Elliott's sentencing be continued again—both so the government would have time to consider and respond to Mr. Elliott's constitutional claims and so defense counsel could investigate various matters raised in the government's earlier-filed request for an upward variance. ROA.306, 834. Counsel also noted that the government and defense were working

---

[1] Counsel also argued that § 922(g)(1) is unconstitutional on its face and an impermissible exercise of Commerce Clause power, while recognizing that those arguments are foreclosed. ROA.287, 298.

9

together to develop a potential global plea that would resolve outstanding state charges and permit an agreement on an appropriate sentence in the federal case. ROA.306. The district court granted that motion and additionally ordered the government to respond to the defense's motion to dismiss. ROA.315.

The government filed its response on November 27, 2023. ROA.319. While opposing the motion, the government did not argue that the constitutional defects identified by the defense were improperly raised, nor did the government urge the district court to disregard those claims as untimely. ROA.319-32. Instead, the government responded to each claim on the merits. ROA.219-32.

With the defense's motion and constitutional claims now fully briefed, the issue remained pending before the district court from that point forward. Seven months later, on June 24, 2024, the district court issued an Order and Reasons denying Mr. Elliott's motion to dismiss. ROA.408. At the start of that order, the court labeled Mr. Elliott's motion untimely under Rule 12(b), which lists motions that must be made before trial, such as those that raise "a defect in the indictment, or the information, including: . . . failure to state an offense." ROA.409 (quoting

Fed. R. Crim. P. 12(b)). The court determined that there was no "good cause" to excuse the failure to file a motion to dismiss pre-plea. ROA.410. The district court did not suggest, however, that it had not been sufficiently apprised of the issue, nor that—in the seven months since the motion's filing—that it had not had adequate opportunity to examine the issues raised. To the contrary, the district court went on to specifically address the merits of each issue raised in full. ROA.411-13. That included analyzing the Supreme Court's decision in *United States v. Rahimi*—decided a few days earlier—which applied *Bruen* to § 922(g). ROA.411 (citing *United States v. Rahimi*, 602 U.S. 680 (2024)).

*Sentencing.*

Although Mr. Elliott's sentencing hearing was, at that point, set to occur on July 16, 2024, the district court converted the setting to a status conference, disclosing to the parties the court's belief that U.S. Probation had miscalculated Mr. Elliott's advisory Guidelines range. ROA.424, 570-71. Following the status conference, U.S. Probation issued a "revised" PSR, increasing Mr. Elliott's Guidelines range from 24 to 30 months to 30 to 37 months. ROA.778, 792. That was based on the determination that "the offense involved three to seven firearms," subjecting Mr. Elliott

11

to a two-level enhancement under U.S.S.G. § 2K2.1(b)(1)(A). ROA.784-85. According to U.S. Probation, Mr. Elliott possessed two guns in the instant offense—the Glock in the driver's seat and the Smith & Wesson in the back passenger seat—*and* "on March 14, 2021, the defendant possessed an unknown firearm." ROA.785. That allegation was based on the government's sentencing memorandum, which accused Mr. Elliott of participating in a March 14 homicide before his instant arrest. *See* ROA.845.

The defense objected both to the newly applied enhancement and to the government's request for an upward variance. ROA.431, 885. Counsel noted that the March 14 incident was unrelated to Mr. Elliott's arrest in this case and should not play a part in his Guidelines calculation. ROA.431. Counsel also explained the mitigating circumstances of Mr. Elliott's upbringing that had also been referenced and relied upon by U.S. Probation in the PSR, including Mr. Elliott's witnessing of the shooting deaths of his stepfather and 17-year-old brother as a child. ROA.885-86. Counsel further noted that the conduct that was the subject of the government's motion had been charged and would be properly adjudicated and resolved by the state. ROA.888-90.

On December 5, 2024, Mr. Elliott appeared before the district court for sentencing. ROA.471, 567. The government called three witnesses: ATF Agent Justin Amacker, as well as New Orleans Police Department Detectives Timothy Jones, and Ryan Acoin. ROA.582, 664. Relevant to this appeal, Agent Amacker testified to the Jefferson Parish operation on March 17 that led to Mr. Elliott's arrest in the instant offense, as well as to various images discovered on Mr. Elliott's cell phone, which was searched following that arrest. ROA.590. The district court ultimately relied on that testimony and those images to determine that Mr. Elliott should not just be subject to the two-point enhancement applicable to defendants who possess *three to seven* separate firearms in connection with their offense of conviction, but instead to the harsher, four-point enhancement applicable to those who possess *eight to twenty-four* separate firearms as a part of their offense. *Compare* U.S.S.G. § 2K2.1(b)(1)(A), *with* U.S.S.G. § 2K2.1(b)(1)(B).

Through Agent Amacker, the government introduced and walked through numerous images pulled from Mr. Elliott's phone that contained depictions of firearms. *See* ROA.590-615. Some were photoshoots of sorts, in which Mr. Elliott could be seen posing with firearms. *See, e.g.,*

13

ROA.959. Other files were simply images of firearms on their own, without context or any indication as to whether Mr. Elliott possessed those firearms or simply had an image on his phone. *See, e.g.*, ROA.981.

On direct examination, government led Agent Amacker through each pulled image, along with associated "Metadata." ROA.590-615; ROA.1012-65. In doing so, the government initially attempted to suggest that dates referenced in the Metadata established *exactly when* the photographs were taken and, moreover, that the photographs were taken using Mr. Elliott's phone. ROA.592. However, it quickly became clear that the various dates and times listed in the Metadata files did not in fact establish dates of associated gun possessions nor whether the images came from.

For example, the Metadata for many of the photographs listed multiple conflicting dates, without an explanation of what those dates indicated. *See, e.g.*, ROA.1026 (listing a "created" date of November 4, 2020, but a "Capture Time" of August 16, 2020); *see also* ROA.1030. Often those dates were months apart, and it was not clear which (if either) of those dates corresponded to *when* the photograph was taken and therefore when the activity in the photograph actually occurred. For

example, some photographs listed both a so-called "created date" and a "capture date." ROA.1026, 1030. Some photographs had one date, but not the other, and the government switched back and forth between the two as if they were interchangeable indicators of when a photograph as actually taken, despite the fact that they were clearly different. Some of the photographs had no dates at all. *See, e.g.*, ROA.1062. Further undermining the government's theory that this evidence pinpointed specific dates of firearm possessions, photographs clearly taken in quick succession on the same date and location (by the government's own account) listed *different dates* in their associated Metadata. *See, e.g.*, ROA.1026-29.

Moreover, although Agent Amacker clarified that law enforcement had only searched the single phone associated with Mr. Elliott, the Metadata indicated that the photographs had originated with a whole host of different phones, all different models, not Mr. Elliott's single seized iPhone. ROA.635-36; *see also, e.g.*, ROA.1012; ROA.1023; ROA.1030; ROA.1041; ROA.1060. Agent Amacker admitted that he could not testify that Mr. Elliott had taken *any* of the photographs and that the photographs depicting firearms but not showing Mr. Elliott could have

been sent to him or could be screenshots, rather than an indication that he possessed the firearm shown. ROA.632-33, ROA.636.

Critically, on cross examination, Agent Amacker testified that he could not say *when* the photographs were taken either, only point to dates listed in the Metadata, though he could not say what those dates actually meant or the differences between the various dates listed. ROA.631, 634-35, ROA.636-37. He noted that he was not qualified to testify to that information and that someone else would need to explain the import of the dates he had identified. ROA.636. Thus, although the photographs actually depicting Mr. Elliott holding firearms suggested he possessed the weapon at some point in time, Agent Amacker's testimony made clear that he could not say when those images were taken and, therefore, when those possessions actually occurred. Agent Amacker did testify to his belief that some of the photographs were likely taken at different times in different locations based on their context and, therefore, that Mr. Elliott had possessed firearms multiple times in the past. ROA.637. However, he did not claim that each of those past possessions involved different firearms.

Nonetheless, at the close of the government's evidence, the district

16

court found what not even the government argued, namely, that each individual possession counted in the "firearm" tally under § 2K2.1(b)(1). In doing so, the district court appeared to confuse unlawful possession of a firearm with the number of firearms possessed, for example, stating (incorrectly), "the linchpin of this case is whether this defendant, Mr. Elliot's repeated *instances of being a felon in possession* of a firearm, were relevant conduct justifying the enhancement." ROA.709 (emphasis added). The court went on to conclude, "Mr. Elliot's *previous firearm possessions* were part of the same course of conduct by way of the relevant conduct." ROA.710 (emphasis added). That "course of conduct" conclusion was based on the courts finding of (1) similarity, (2) regularity, and (3) proximity in time.

First, the district court concluded that one firearm possession is always similar to another firearm possession. ROA.712 ("The similarity is that you are a convicted felon in possession of a firearm."). For temporal proximity and regularity, the court then proceeded to go through the government's exhibits, assuming that the dates initially highlighted by Agent Amacker reliably indicated when the firearm possession depicted in each photograph occurred—despite the fact that his testimony had

17

dispelled that notion. ROA.713; *see also, e.g.*, ROA.714 ("Then Exhibit 1.12, . . . the metadata shows that this was taken or captured January 5th, 2021."). Nonetheless, the court specifically relied on those dates in finding temporal proximity to the March 17 offense, noting, "[t]he Fifth Circuit has held this court typically uses one year as the benchmark for determining temporal proximity[.]." ROA.716.

Moreover, in going through each exhibit, the Court did not find (or even consider), whether the various firearms depicted were *different* from one another—instead, simply counting the number of times photographs depicted Mr. Elliott's possession of a firearm. *See* ROA.713-15. At the conclusion of that summary—relying on the erroneous dates and firearm possessions—the Court concluded:

> The Court finds by more than a preponderance of the evidence that you, Mr. Elliott, a convicted felon, was found in possession of a firearm for this offense on March 17th, 2021, two firearms; on March 14th, 2021; on April 4th, 2020; on December 24th, 2020; on October 20th, 2020; on January 5th, 2021; on January 30th, 2021; on January 31st, 2021; on March 1st, 2021; and on March 13th, 2021. The Court finds that all of the factors are satisfied, and you *possessed firearms on all of those occasions*. Therefore, the Court further finds that the specific offense characteristics of 2K2.1(b)(1) should be applied, and your attorney's objection is overruled.

ROA.717. Based on that summary, the district court concluded that

18

Mr. Elliott was subject to the "four-level enhancement for possessing *8 to 24 firearms*." ROA.720. Thus, the Court calculated the advisory Guidelines range as to Counts 1 through 3 as 37 to 46 months, for an aggregate range of 97 to 106 months when including the § 924(c) consecutive term. ROA.725.

Defense counsel objected, noting that U.S. Probation had only ever claimed that *three* firearms were different from one another, not eight to twenty-four. ROA.720-21. Counsel also reminded the court that the Guideline enhancement was concerned with the number of distinct firearms involved in the offense, not number of past possessions that a defendant had engaged in. ROA.721. Counsel urged that while the district court had "identified a number of possessions, our objection would be on the evidence in the record concerning the number of firearms because there was not evidence of the sort of the specific -- the particular firearm in order to differentiate whether or not there were we'll say duplicate possessions of the same weapon." ROA.721.

The court overruled that objection initially, ROA.722, though later returned to the issue to clarify the court's count of "different" firearms. In doing so, the Court only came to *five* different firearms this time. *See*

ROA.737 ("[A]t the very least, at the very least, I can distinguish in all of these photographs of you possessing firearms of at least five different ones in the photographs."). It appears that the district court then may have simply added that "five" to the one firearm from the homicide and the two from the offense of conviction, for a total of eight. ROA.738. But the district court did not find, and the evidence did not show, that those firearms were distinct from the five in the photographs already counted by the court.

Following that discussion, the court imposed a dramatic upward variance from the already-elevated range. Specifically, the court sentenced Mr. Elliott to a ten-year sentence as to Counts 1 through 3 (the maximum term permissible for the two firearms counts), to run consecutively to the mandatory five-year sentence for Count 4—for an aggregate sentence of 15 years. ROA.486.

## SUMMARY OF THE ARGUMENT

Numerous constitutional defects mandate reversal of Mr. Elliott's convictions under 18 U.S.C. § 922(g)(1) and § 922(o). First, 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment as applied to Mr. Elliott. Importantly, Mr. Elliott's only prior felony conviction is for simple possession of cocaine, and the government wholly failed to show that disarming those with similar, nonviolent felony records is consistent with the Nation's historical traditions as required by *Bruen*. In the alternative, this Court should find that § 922(g)(1) is now unconstitutionally vague. Indeed, the piecemeal approach employed by courts post-*Bruen* has made it impossible to discern who has and hasn't been permanently divested of their Second Amendment rights. With respect to the § 922(o) conviction, that statute too is unconstitutional as applied to Mr. Elliott under *Bruen* and must be reversed.

Even if this Court affirms Mr. Elliott's convictions, it should vacate his sentence based on the district court's clearly erroneous application of U.S.S.G. § 2K2.1(b)(1)(B), which misapprehended the purpose of the enhancement, as well as the evidence upon which the enhancement relied.

## ARGUMENT

### I.  Mr. Elliott's firearm convictions under 18 U.S.C. § 922(g) and (o) are unconstitutional and must be reversed.

*A. Standard of Review.*

This Court reviews preserved challenges to the constitutionality of federal statutes *de novo. United States v. Copeland*, 820 F.3d 809, 811 (5th Cir. 2016). By contrast, a constitutional challenge to a defendant's statute of conviction is reviewed for plain error when it is raised for the first time on appeal. *United States v. Toure*, 965 F.3d 393, 399 (5th Cir. 2020). To satisfy the plain error standard of review, a defendant must demonstrate "clear or obvious" error that affects his substantial rights. *Id.* If those requirements are satisfied, this Court exercises its discretion to correct the error "only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation marks and citations omitted).

Here, Mr. Elliott preserved his constitutional challenge by filing an extensive motion to dismiss, which brought the issue to the attention of the district court and provided the government with a chance to respond, which it did on the merits. ROA.287, 319. The district court had more than sufficient opportunity to examine the issues and rule on the merits.

Seven months after the issues were fully briefed, the district court, while initially indicating its conclusion that the motion was untimely, also proceeded to decide the motion in the first instance on the merits. ROA.411.

Thus, the constitutional challenges raised on appeal were both presented to and ruled upon by the district court and were therefore preserved. New counsel requested and was granted time to review the case, at which point she filed a well-supported motion, ensuring that the government would have time to respond. Certainly, the defense could not be accused of lying-in-wait—hiding the issue until it could not be addressed.

Importantly, "the contemporaneous-objection rule prevents a litigant from 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Puckett v. United States*, 556 U.S. 129, 134 (2009). The purpose of preservation rules is "to alert the district court to the nature of the alleged error and to provide an opportunity for correction." *United States v. Hernandez-Montes*, 831 F.3d 284, 290 (5th Cir. 2016) (citation omitted). The "[k]ey is whether the objection is specific enough to allow

23

the court to take evidence and receive argument on the issue." *Id*. That happened here. The district court was apprised of the error, had full opportunity to take argument and address it, and then did so.

If this Court' disagrees as to the issue of preservation, however, Mr. Elliott's constitutional challenges would prevail under a plain-error standard as well. Thus, out of an abundance of caution, he has briefed both standards herein.

> ### B. 18 U.S.C. § 922(g)(1) is unconstitutional as applied to Mr. Elliott, whose only prior felony is a simple narcotics possession.

First, the district court erred in declining to dismiss the § 922(g)(1) charge, because that law is unconstitutional under the Second Amendment as applied to Mr. Elliott, whose only prior felony is a simple cocaine possession offense.

> 1. The *Bruen/Diaz* Framework.

"The Second Amendment protects the right of individuals to 'keep and bear' firearms for their self-defense." *United States v. Connelly*, 117 F.4th 269, 273 (5th Cir. 2024). In *Dist. of Columbia v. Heller*, the Supreme Court held that the Second Amendment codifies an individual right to possess and carry weapons, explaining that the "inherent right of self-defense" is "central" to its protections. 554 U.S. 570, 628 (2008*); see also*

*McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). Indeed, "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (quoting *McDonald*, 561 U.S. at 778).

In *Bruen*, the Supreme Court explained that the framework for analyzing the constitutionality of firearm regulations is rooted in the Second Amendment's text and history, and expressly abrogated the framework previously adopted by this Court and its sister circuits. *See* 597 U.S. at 19-24. Prior to *Bruen*, the Circuits had relied on both historical tradition *and* means-end scrutiny when analyzing the constitutionality of firearm regulations under the Second Amendment. *See id.* But *Bruen* made clear that this "two-step approach" was "one step too many" and that "means-end scrutiny" has no role to play in the Second Amendment context. *Id.* at 19.

Under *Bruen*'s framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17, 24. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In other words, to

25

pass Second Amendment muster, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. In *Rahimi*, the Supreme Court reaffirmed that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" and explained that "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29) (alteration in original). "Why and how the regulation burdens the right are central to this inquiry." *Id.* (citing *Bruen*, 597 U.S. at 29).

As this Court explained post-*Rahimi*, "'[w]hy' and 'how' a regulation burdens the right presents two separate questions." *Connelly*, 117 F.4th at 273. As to "why": "if laws at the Founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category." *Id.* at 274 (quoting *Rahimi*, 144 S. Ct. at 1898). As to "how": "a law . . . may not be compatible with the right if it

26

[is regulated] to an extent beyond what was done at the Founding[,]" "*even when [that] law regulates arms-bearing for a permissible reason.*" *Id.* (quoting *Rahimi*, 144 S. Ct. at 1898) (alterations and emphasis in original). Importantly, "[t]he challenged and historical laws are 'relevantly similar' if they share a common 'why' and 'how': they must *both* (1) address a comparable problem (the 'why') *and* (2) place a comparable burden on the right holder (the 'how')." *Id.* (emphasis added).

Critically, "[i]t is the government's burden to demonstrate that the challenged regulation is 'relevantly similar' to laws our tradition is understood to permit . . . by finding and explicating 'historical precursors' supporting the challenged law's constitutionality." *Id.* (citations omitted). While the government may rely on "analogous historical regulation[s]" and need not identify a "historical twin," a court must always "hold the government to its heavy burden, as the Second Amendment 'is *not* a second-class right.'" *Id.* (quoting *Bruen*, 597 U.S. at 70) (emphasis in original). This means that there are limits to analogical reasoning, as the Supreme Court cautioned in *Bruen*: "To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." 597 U.S. at 30. Thus, "courts should not

27

'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)) (alteration in original).

This Court applied *Bruen* and *Rahimi* to 18 U.S.C. § 922(g)(1) in *United States v. Diaz* and, in doing so, provided important guidance for analyzing § 922(g)(1) challenges under the new framework. *Diaz* included four holdings that are especially pertinent here.

First, this Court confirmed that *Bruen* rendered prior circuit precedent upholding the constitutionality of 18 U.S.C. § 922(g)(1) "obsolete"—explicitly rejecting the government's argument that "earlier cases survive *Bruen*" and holding: "The law of orderliness mandates that we abandon that prior precedent." *Diaz,* 116 F.4th at 465 (recognizing the abrogation of *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003), and their progeny). Further, *Diaz* held that the "mentions of felons" in *Heller* and *Rahimi* "are mere dicta." *Id.* at 466. In doing so, the Court rejected the government's contention that the § 922(g)(1) analysis can "begin and end" with the language in those decisions stating that prohibitions on the

possession of firearms by "felons and the mentally ill" are "presumptively lawful." *Id.* at 465-66. The Court made clear that such dicta does not render § 922(g)(1) constitutional and "cannot supplant the most recent analysis set forth by the Supreme Court in *Rahimi.*" *Id.* at 466 ("Without precedent that conducts *Bruen*'s historical inquiry into our Nation's tradition of regulating firearm possession by felons in particular, we must do so ourselves.").

Second, *Diaz* held that persons convicted of felonies, including Mr. Elliott, are among "the people" protected by the Second Amendment, flatly rejecting the government's argument to the contrary. *Id.* at 466-67. *Diaz* further held that "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)," and that "[t]he burden thus shifts to the government to demonstrate that regulating [a person's] possession of a firearm is 'consistent with the Nation's historical tradition of firearm regulation.'" *Id.* at 467 (quoting *Bruen*, 597 U.S. at 24). Thus, under *Diaz*, Mr. Elliott's conduct is covered by the Second Amendment, and the burden is on the government to demonstrate that permanently disarming him is consistent with historical tradition.

Third, *Diaz* explained that "[t]o survive [a defendant's] as-applied

challenge, the government must demonstrate that the Nation has a longstanding tradition of disarming someone *with a criminal history analogous to [his].*" *Id.* at 467 (emphasis added). And, to do so, government must establish "a historical tradition of permanently punishing [via capital punishment and/or permanent estate forfeiture] certain offenders who the evidence shows would have been considered felons and exposed to these types of penalties at the time of the Founding," *and* show that "[d]isarming [a particular defendant] fits within this tradition" by using historical evidence "specifically targeted to [the defendant's] circumstances" (like "colonial-era laws") to demonstrate that his modern-day felony convictions are analogous to Founding-era felonies punishable by death or permanent estate forfeiture. *Id.* at 469-70.

Importantly, *Diaz* emphasized that "[s]imply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny" because "not all felons today would have been considered felons at the Founding." *Id.*; *see also id.* at 468 ("The fact that Diaz is a felon today, then, does not necessarily mean that he would have been one in the 18th century."). And *Diaz* held that its rigorous historical approach

is mandated by precedent. *Id.*; *see Bruen*, 597 U.S. at 29-30; *Rahimi*, 144 S. Ct. at 1898; *Connelly*, 117 F.4th at 273-74. As Justice Barrett explained in her *Rahimi* concurrence, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring). Consistent with Justice Barrett's approach, this Court in *Diaz* looked to the principles undergirding this Nation's "tradition of serious and permanent punishment" for persons who "would have been considered felons at the Founding" and assessed whether those principles justified § 922(g)(1) permanent prohibition on firearm possession as applied to the defendant in that case. *Diaz*, 116 F.4th at 469-70.

Fourth, in *Diaz*, the government was able to carry its burden as to that *particular* defendant based on his *specific* convictions. *See id.* at 468-70. Mr. Diaz had been convicted of "car theft," and the Court considered historical evidence—"colonial-era laws"—showing that certain types of theft, including "horse theft," "correspond to the law against theft of a vehicle that serves as a predicate offense for Diaz's § 922(g)(1) charge." *Id.* at 467-68. The Court then reasoned that "if capital punishment was permissible to respond to theft, then the lesser restriction of permanent

31

disarmament that § 922(g)(1) imposes is also permissible," *Id.* at 469. The Court thus determined that based on his criminal history permanently disarming Mr. Diaz fit within the "historical tradition of permanently punishing certain offenders who the evidence shows would have been considered felons and exposed to these types of penalties at the time of the Founding," and, thus, that the statute was constitutional as applied to him. *Id.*

However, *Diaz* also expressly announced that its holding "does not foreclose future as-applied challenges by defendants with different predicate convictions." *Id.* at 470 n.4. In other words, each defendant must be looked at independently in the context of an as-applied challenge. Here, Mr. Elliott has a "different predicate conviction[ ]" than the defendant in *Diaz*. Thus, *Diaz*'s conclusion that § 922(g)(1) was constitutional as applied to that defendant has no application here.[2]

    2. <u>The district court's ruling below was erroneous (clearly and obviously so), because it ignored the *Bruen* framework and instead simply relied on now-invalidated precent.</u>

---

[2] Mr. Elliott respectfully disagrees with the historical analogues and reasoning that the Fifth Circuit relied on in denying the constitutional challenges in *Diaz*. Recognizing that *Diaz* is currently the controlling Circuit precedent, however, he merely notes this disagreement to preserve this claim for potential further review. Even under *Diaz*, however, Mr. Elliott's conviction should be vacated, as explained herein.

As an initial matter, in the proceeding below, the district court did not hold the government to its heavy burden and did not engage in the historical analysis required under *Bruen* and *Diaz.* Instead, the court denied Mr. Elliott's motion based on its conclusion that *Bruen* did not disturb prior Fifth Circuit precedent upholding the constitutionality of § 922(g)(1) and, even if it did, that the district court lacked the authority to make that determination. ROA.411. That was clear and obvious error. Indeed, this Court in *Diaz* definitively and explicitly recognized that *Bruen* overruled prior circuit precedent upholding the constitutionality of § 922(g)(1). *Diaz,* 116 F.4th at 465. In other words, the historical analysis compelled by *Bruen* must occur in each case.

    3. <u>Section 922(g)(1) is unconstitutional as applied to Mr. Elliott—clearly and obviously so.</u>

Even if the district court had insisted that the government carry its heavy burden, the government would not have been able to do so. Mr. Elliott has a single prior felony conviction for possession of cocaine. Under this Court's caselaw, however, that is not a constitutional predicate for a § 922(g)(1) conviction. *See Connelly*, 117 F.4th 269; *United States v. Kimble*, No. 23-50874, 2025 WL 1793832 (5th Cir. June 30, 2025). Accordingly, this Court should vacate Mr. Elliott's § 922(g)(1)

conviction and order dismissal of the indictment.

As a matter of historical fact, this Court has recognized that "[t]here was very little regulation of drugs (related to firearm possession or otherwise) until the late 19th century," demonstrating that permanently disarming people based on the possession of controlled substances is clearly inconsistent with the Nation's history of firearm regulation. *Connelly*, 117 F.4th at 279; *see also Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 482 (2020) (explaining that a tradition that "arose in the second half of the 19th century . . ., of course, cannot by itself establish an early American tradition").

Moreover, this Court in *Connelly* looked to "alcohol"—which this Court held was "the next-closest 'historical analogue'" to drugs—and determined also that "[f]ounding-era laws concerning guns and alcohol were few, and primarily concerned with (1) misuse of weapons *while* intoxicated and (2) disciplining state militias." *Connelly*, 117 F.4th at 279-80 (emphases added); *see id.* at 274 (explaining that the government may rely on "analogous historical regulation[s]" and need not identify a "historical twin"). Indeed, according to this Court, no historical laws "barred gun *possession* by regular drinkers," *id.* at 280, and there

34

certainly is no evidence that colonial-era Americans could be punished by death or estate forfeiture for possessing alcohol.[3]

Thus, in *Connelly*, this Court expressly rejected the notion that possessing drugs or alcohol could constitutionally justify a categorical and permanent prohibition on firearm possession. *Id.* at 282 ("The history and tradition before us support, at most, a ban on carrying firearms while an individual is *presently* under the influence." (original emphasis)). Therefore, Mr. Elliott's prior conviction for cocaine possession is an unconstitutional predicate for a § 922(g)(1) conviction.[4]

---

[3] To be sure, the lack of such laws is not because the Founding generation were more temperate drinkers than later Americans. To the contrary, as this Court explained in *Connelly*, "early Americans, including the Founders, consumed copious amounts of alcohol." *Connelly*, 117 F.4th at 279; *see also id.* at n.4 (explaining "that '[i]n the early Republic,' there was 'an extremely high level of alcohol consumption (chiefly, distilled spirits)'") (quoting David F. Musto, The American Experience with Stimulants and Opiates, 2 Persps. on Crime & Just. 51, 52 (1998)).

[4] Further, the Court noted that Founding-era laws only prohibited *firing* guns while drunk and that the purpose, *i.e.* the "why," behind some of these intoxication laws was "gunpowder preservation"—not public safety. *Connelly*, 117 F.4th at 280 & n.5. And, of course, "[t]he purpose behind . . . militia laws concerns military service— intoxicated servicemembers cannot perform their duties while impaired." *Id.* at 281. "More than that, these laws applied only to militia members . . . Then, as today, restrictions on the liberties of service members tell us little about the limits acceptable for citizens at large." *Id.* The Court went on to explain that it was not until "after the Civil War" that "a few states" passed laws "barring carrying weapons while under the influence," but, according to the Court, "[t]hese non-Founding era historical laws are of, at best, limited utility." *Id.* (citing *Bruen*, 597 U.S. at 4); *see also id.* at 281-82 ("Taken together, the statutes provide support for banning the *carry* of firearms *while actively intoxicated*.") (emphasis in original); *but see id.* at 281 (explaining that the government's Reconstruction-Era evidence is not sufficient under *Bruen*, which directs courts to look at Founding-era evidence, such

This Court's recent holding in *Kimble* further bolsters that conclusion. *Kimble* held that defendants with a prior conviction for drug *trafficking* can be disarmed pursuant to a historical tradition of disarming classes of dangerous people. Importantly, in doing so, the Court explicitly drew a distinction between drug *trafficking* and drug *use* or *possession,* by comparing *Kimble* with *Connelly*. *See Kimble*, 2025 WL 1793832, at *6 (citing and quoting *Connelly,* 117 F.4th at 277-78).

Indeed, *Kimble* noted that "[t]he government invokes much of the same historical evidence that it did in *Connelly*" and that *Connelly* "rejected those analogies" because drug users "were not 'dangerous' for reasons comparable to those targeted by the government's proffered analogues." *Id.* (citing *Connelly*, 17 F.4th at 277-78). "But the government's analogues are a closer fit for drug *traffickers* than for occasional drug users," *Kimble* explained, because "drug *trafficking* is an inherently dangerous activity." *Kimble*, at *7 (emphasis added). The Court thus drew a clear line between drug trafficking convictions (inherently dangerous) and drug use/possession convictions (*not*

---

that"[o]ffering three laws passed scores of years post-Ratification (and a fourth passed nearly half a century beyond that) misses the mark by a wide margin").

inherently dangerous). Thus, pursuant to *Kimble* and *Connelly*, Mr. Elliott's conviction—which is based solely on a prior conviction for drug possession—should be vacated.

Notably, in the proceedings below, the government relied on much of the same argument and historical sources that the Court accepted in *Kimble* but rejected in *Connelly*. *Id.* (noting the government's reliance on "English laws disarming political and religious dissidents and American statements and practices suggesting that dangerous individuals could lose their Second Amendment rights"); *see* ROA.325 (discussing English laws and the Pennsylvania antifederalists proposal). Further, the district court adopted and relied on the government's reasons. ROA.412 (adopting "the reasons set forth in the Government's Opposition brief").

Thus, it is error to uphold a § 922(g)(1) conviction, like Mr. Elliott's, based on a prior conviction for drug possession. Further, under *Connelly* and *Kimble*, that error is clear and obvious.

*C. In the alternative, § 922(g)(1) is unconstitutionally vague.*

Mr. Elliott's § 922(g)(1) conviction should be vacated for a second, independent reason, namely, because the statute is unconstitutionally

vague under the Fifth Amendment's Due Process Clause and violates separation of powers principles.

Since *Bruen,* courts have avoided striking down § 922(g)(1) in its entirety by instead deeming it constitutional or unconstitutional as applied to certain subsets of felons or even on an individualized basis. *See, e.g. Range v. Att'y Gen. United States of Am.,* 69 F.4th 96, 103-06 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range,* 144 S. Ct. 2706 (2024), *on remand,* 124 F.4th 218 (3d Cir. 2024); *Diaz,* 116 F.4th at 470 n.4; *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024). Under this piecemeal approach, some people with felony convictions will be deemed outside the scope of § 922(g)(1)'s reach, while others will continue to face prosecution. But reading § 922(g)(1) to save it from one constitutional peril (wholesale invalidation under the Second Amendment) exposes it to another (a due process violation under the Fifth Amendment). *See Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 410-11 (3d Cir. 2016) (Fuentes, J., concurring in part and dissenting in part); *Range,* 69 F.4th at 132 (Krause, J., dissenting) (citation omitted).

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The Supreme Court has explained that the government "violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)). A statute that leaves "grave uncertainty" about its reach cannot pass Due Process muster. *Id.* at 592, 598. Rather, a statute "must be sufficiently focused to forewarn of both its reach and coverage." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 33 (1963). And "[t]his appears to be especially true where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights"—like the Second Amendment right to keep and bear arms at issue here. *See Colautti v. Franklin*, 439 U.S. 379, 391 (1979), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)).

These are longstanding principles that have been in place for over a century. In *United States v. Reese*, the Supreme Court considered

39

"whether a penal statute enacted by Congress, . . . which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish." 92 U.S. 214, 219 (1875). In other words, the question was "whether [a court] can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only." *Id.* The Court held no and struck down the law for two interrelated reasons. *Id.*

First, the Court identified due process concerns: "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *Reese*, 92 U.S. at 221. And second, it identified separation of powers concerns that resulted from the statute's vagueness: "This would, to some extent, substitute the judicial for the legislative department of the government." *Id.* "To limit this statute in the manner now asked for would be [to] make a new law, not to enforce an old one. This is no part of [the judicial] duty." *Id.*; *see also United States v. Davis*, 588 U.S. 445, 451 (2019) ("Our doctrine prohibiting the enforcement of vague laws rests on the twin

40

constitutional pillars of due process and separation of powers."). Thus, a criminal law that utilizes general language to prohibit conduct that is both within and without constitutional power to prohibit—like § 922(g)(1) does—is unconstitutionally vague.

The concerns identified by the Supreme Court in *Reese* apply with equal force to § 922(g)(1). Here, the statute uses general language to prohibit firearm possession by "any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." Congress's use of such broad and general language, however, means that the statute covers persons whose firearm rights are both within and outside its power to prohibit consistent with the Second Amendment. In response, numerous courts—including the Fifth Circuit—have limited the statute via judicial construction on an as-applied, case-by-case, ad hoc basis to keep the statute within the strictures of the Second Amendment. The upshot is significant and insurmountable due process and separation of powers concerns that render the statute unconstitutional.

First, § 922(g)(1) violates due process because it does not provides fair notice that permits an individual previously convicted of a crime

41

punishable by more than a year of imprisonment to determine whether he or she can exercise his or her constitutionally protected right to possess a firearm without the risk of criminal prosecution and imprisonment up to 15 years, creating an untenable chilling effect on the Second Amendment. *See Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."). The statute "tie[s] criminal culpability" to overly broad, general language "without statutory definitions, narrowing context, or settled legal meanings," rendering the statute unconstitutionally vague. *United States v. Williams*, 553 U.S. 285, 306 (2008). Thus, as written, § 922(g)(1) leaves ordinary people uncertain as to what "convict[ions]" for what "crime[s]" actually fall within the constitutional ambit of the statute and which "person[s]" are actually prohibited from possessing firearms as a result. *See Winters v. New York*, 333 U.S. 507, 515-16 (1948) ("The vagueness may be from uncertainty in regard to persons within the scope of the act, or in regard to the applicable tests to ascertain guilt." (internal citation omitted)).

Accordingly, the statute is unconstitutionally vague under the Fifth Amendment.

Second, the statute's vagueness results in a delegation of the legislative function to the judiciary in violation of separation of powers principles. Courts' applying § 922(g)(1)'s vague text on a case-by-case basis to bring it within its constitutional limits "threaten[s] to hand responsibility for defining crimes" to judges. *Davis*, 588 U.S. at 451 (citations omitted). This is not how our tripartite system of government is supposed to work: "Under our system of separated powers, the Legislative Branch must do the hard work of writing federal criminal laws. Congress cannot give the Judiciary uncut marble with instructions to chip away all that does not resemble David." *Percoco v. United States*, 598 U.S. 319, 337 (2023) (Gorsuch, J., concurring) (citing *Reese*, 92 U.S. at 221). Yet, that is what Congress has done with § 922(g)(1). Congress has "set a net large enough to catch all possible offenders, and [left] it to the courts to step inside and say who could be rightfully detained, and who should be set at large"—something the Supreme Court has held not only unconstitutional, but "dangerous." *Reese*, 92 U.S. at 221.

As Justice Scalia succinctly explained, "[a] statute that is unconstitutionally vague cannot be saved . . . by judicial construction that writes in specific criteria that its text does not contain." *Skilling v. United States*, 561 U.S. 358, 415-16 (2010) (Scalia, J., concurring) (citing *Reese*, 92 U.S. at 219-21). Nor is there any de minimis exception to vagueness concerns under the Due Process Clause. Indeed, "even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). Here, § 922(g)(1) fails to establish constitutional standards for the police, prosecutors, judges, and the public. Thus, under the Fifth Amendment, it is unconstitutionally vague.

These important constitutional limitations are not merely academic—they are fundamental to our criminal legal system. The void-for-vagueness doctrine protects "several important values." *Grayned*, 408 U.S. at 108. "First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is

44

prohibited, so that he may act accordingly." *Id.* In other words, vague laws violate due process because they do not provide "fair warning." *Id.* "Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id.* In other words, "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108-09. Third, and especially relevant here, a vague law that "abuts upon sensitive areas" of constitutional freedom "operates to inhibit the exercise of those freedoms." *Id.* at 109 (cleaned up). Section 922(g)(1) fails to comport with these values.

Below, the government did not engage with the substance of Mr. Elliott's arguments, but instead asserted in a single paragraph that the statute was not unconstitutionally vague. ROA.330-31. The district court adopted this position, but did not explicitly address Mr. Elliott's vagueness challenge. ROA.412. That was error.

> *D. 18 U.S.C. § 922(o) is unconstitutional under* Bruen—*both on its face and as applied to Mr. Elliott.*

Applying the *Bruen* framework described above, § 922(o) also violates the Second Amendment, both facially and as applied. The Second

45

Amendment's plain text applies to Mr. Elliott's alleged conduct. *See Connelly*, 117 F.4th at 273 (citing *Bruen,* 597 U.S. at 17). Thus, the government must bear the "heavy burden" of establishing that § 922(o) "is consistent with the principles that underpin our regulatory tradition." *Id.* at 274 (citations omitted). But in opposing Mr. Elliott's motion below, it did not even attempt to do so. Rather, the government *only* argued that "machine guns do not receive Second Amendment protection" at all, relying on pre-*Bruen* precedent for support. ROA.331 (citing *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016)). The district court likewise denied the motion solely by relying on *Hollis*, instead of holding the government to its burden. ROA.412. That was error. Moreover, the error is clear and obvious under *Diaz*.

To start, the plain text of the Second Amendment guarantees an individual's right to keep and bear arms, and thus presumptively protects Mr. Elliott's alleged conduct. *See Heller*, 554 U.S. at 629; *McDonald*, 561 U.S. at 767; *Bruen,* 597 U.S. at 32, 47. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. As *Heller* explained, the term "bearable arms" includes

any "[w]eapo[n] of offence" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] . . . for the purpose of offensive or defensive action." *Id.* at 581, 584 (internal quotation marks omitted). Applying this broad definition, a machinegun is a "bearable arm" and is therefore prima facie entitled to Second Amendment protection. *See id.*; *see also Bruen*, 597 U.S. at 28 ("[T]hat general definition covers modern instruments that facilitate armed self-defense.").

True, this argument was previously foreclosed by pre-*Bruen* Fifth Circuit precedent. *See Hollis*, 827 F.3d 436, *abrogation recognized by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024). But that is no longer so because, as this Court recognized in *Diaz*, that precedent "predates *Bruen*, which established a new historical paradigm for analyzing Second Amendment claims" and, in doing so, "render[ed] . . . prior precedent obsolete." *Diaz*, 116 F.4th at 465.

The *Diaz* analysis further confirms that it was clear and obvious error for the district court to hold that machineguns are not "arms" (rather than requiring the government to prove that § 922(o) is consistent with historical tradition). Indeed, *Diaz* explained that "[t]here are two approaches to take in considering the constitutionality of gun

47

regulations." *Diaz*, 116 F.4th at 466. "[O]ne approach 'uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.'" *Id.* (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)). "*Bruen* mandates the second approach." *Id.* (citing 597 U.S. at 70).

*Diaz* therefore held that a person's "status as a felon is relevant to [the] analysis, but it becomes so in *Bruen*'s second step of whether regulating firearm use in this way is 'consistent with the Nation's historical tradition' rather than in considering the Second Amendment's initial applicability." *Id.* at 466-67 (quoting *Bruen*, 597 U.S. at 24). In other words, the *Bruen* analysis "is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation." *Id.* (citing *Rahimi*, 602 U.S. at 692). Likewise, the fact that the arm is a machinegun "is relevant to [the] analysis, but it becomes so in *Bruen*'s second step . . . rather than in considering the Second Amendment's initial applicability" *Id.* at 466-67 (quoting *Bruen*, 597 U.S. at 24). The analysis "is effectively collapsed into one question:

48

whether [§ 922(o)] is consistent with our Nation's history of firearm regulation." *Id.*

Thus, this Court's pre-*Bruen* holding in *Hollis* has been abrogated because it is fundamentally inconsistent with *Bruen*. *See Diaz*, 116 F.4th at 466-67; *Rahimi*, 602 U.S. at 692. Machineguns are bearable arms that receive prima facie constitutional protection. Under *Bruen*, the government therefore bears the "heavy burden" of proving that § 922(o) "is consistent with the principles that underpin our regulatory tradition." *Connelly*, 117 F.4th at 274. And it must do so "by finding and explicating historical precursors" that "demonstrate that [§ 922(o)] is relevantly similar to laws our tradition is understood to permit." *Id.* (cleaned up). Importantly, this means that the government must prove that "[§ 922(o)] and historical laws are relevantly similar" because "they share a common 'why' and 'how': they must *both* (1) address a comparable problem (the 'why') *and* (2) place a comparable burden on the right holder (the 'how')." *Id.* (emphasis added).

Here, however, the district court did not hold the government to that burden. The government failed to even argue Step Two of the *Bruen* analysis, much less introduce the requisite historical evidence. Instead,

the government only argued that machineguns are not protected under the text of the Second Amendment at *Bruen* Step One by relying on obsolete precedent. The district court, therefore, erred in denying Mr. Elliott's motion by relying on *Hollis*, without holding the government to its heavy burden under *Bruen*.

Further, that error is clear and obvious under *Diaz*, which held that pre-*Bruen* precedent was "obsolete" and that *Bruen* "mandates" an analytical approach whereby the government must bring forth historical evidence to identify the scope of the government's power to regulate the right at Step Two, which it did not do here. *Diaz*, 116 F.4th at 465-66.

> *E. Although preserved, these errors also satisfy the requirements of plain-error review.*

As discussed above, these errors were fully and carefully briefed for the district court, the government was provided an opportunity to respond and did so, and the district court had seven months to consider the parties arguments—and did so. However, as also explained above, the errors satisfy the first two prongs of plain-error review, as they are clear and obvious under existing caselaw.

These errors additionally satisfy the second two requirements of plain error because they affect Mr. Elliott's substantial rights, as well as

the fairness, integrity, and public reputation of judicial proceedings. Indeed, Mr. Elliott is serving two, ten-year sentences (the maximum permissible under those statutes) for unconstitutional convictions that infringe upon his fundamental Second Amendment rights. Moreover, *those* convictions—not the relatively minor drug offense—drove his applicable Guidelines range. *See* ROA.763 (explaining the Guidelines grouping rules applicable to this offense). Therefore, there is no question that the error affected Mr. Elliott's substantial rights and seriously affected the fairness and integrity of judicial proceedings. *See United States v. Knowles*, 29 F.3d 947, 951 (5th Cir. 1994).

Thus, regardless of the standard of review, this Court should intervene.

> *F. In light of* Bruen*, § 922(g)(1) is unconstitutional on its face and exceeds Congress's authority under the Commerce Clause [Foreclosed].*

Finally, although recognizing that the arguments are foreclosed, Mr. Elliott respectfully raises two additional constitutional challenges to § 922 to preserve those arguments for further review, as counsel did below.

*First,* Mr. Elliott respectfully disagrees with *Diaz's* conclusion that

§ 922(g)(1) is facially constitutional. *See* 116 F.4th at 471-72. Specifically, there is no historical support for *permanently* prohibiting firearm possession, with no exceptions, nor process for regaining one's Second Amendment rights. *See Rahimi*, 144 S. Ct. at 1898 ("Even when a law regulates arms-bearing for a permissible reason . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding."); *see also Connelly*, 117 F.4th at 274. Rather, the historical evidence shows that the type of absolutist regulation contained in § 922(g)(1) is wholly inconsistent "with the principles that underpin our regulatory tradition," and therefore the statute violates the Second Amendment. *Rahimi*, 144 S. Ct. at 1898.

For example, as the Supreme Court explained in *Rahimi*, surety laws and "going armed" laws establish a regulatory tradition of "temporary" disarmament (and only after a judicial determination that the person posed a credible threat to the physical safety of others). *Id.* at 1901-02. Further, according *Rahimi*, a person subject to a surety bond received "significant procedural protections" and, importantly, "could obtain an exception if he needed his arms for self-defense or some other legitimate reasons." *Id.* at 1900. "Many postfounding going armed laws"

52

incorporated similar exceptions. *See id.* at 1942 (Thomas, J., dissenting). Not so for § 922(g)(1), which is permanent and contains no exceptions.

Additionally, people who were temporarily disarmed for political or religious reasons in the Founding Era "could often regain their rights once they were no longer perceived as dangerous." Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 250 (2020). Even "armed insurrectionists" "regained their rights once they no longer posed a violent threat." *Id.* at 269. Again, not so for § 922(g)(1).

It was not until the 20th century that legislatures began to pass categorical, permanent firearms bans—eventually expanding those bans to include all persons who have ever been convicted of a criminal offense punishable by imprisonment for a term exceeding one year, i.e., "felons." *See* Greenlee at 272-75. Accordingly, § 922(g)(1)'s *permanent* ban on firearm possession violates the Second Amendment.

*Second*, again recognizing that the issue currently is foreclosed by circuit precedent, Mr. Elliott raises to preserve for further review that 18 U.S.C. § 922(g)(1) exceeds Congress's authority to regulate interstate and foreign commerce and that his factual basis failed to demonstrate the

requisite interstate commerce nexus to support a valid conviction. *See United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at \*2 (5th Cir. Aug. 24, 2022) (unpublished) (summarizing precedent).

Article I, § 8 of the Constitution provides: "Congress shall have power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes …." In *United States v. Lopez*, the Supreme Court established the test for the scope of Congress's power to regulate activities that "affect" interstate commerce: "We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." 514 U.S. 549, 559 (1995). *Lopez* seemed to, but did not expressly, overrule the more permissive test for federal regulation of gun possession articulated in *Scarborough v. United States*, which required only the "minimal nexus that the firearm have been, at some time, in interstate commerce." 431 U.S. 563, 575 (1977). A fair reading of *Scarborough* suggests that the case was concerned with statutory interpretation and did not purport to resolve any constitutional issues. *See Seekins*, 52 F.4th at 991 (Ho, J., dissenting from denial of rehearing en banc). This Court has adhered to the view that

54

*Scarborough*'s "minimal nexus" is sufficient both to prove guilt under § 922(g)(1) and to bring any subsequent act of firearm possession within Congress's power to regulate. *See, e.g., United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

Members of the Supreme Court and judges on lower courts have acknowledged the irreconcilability of *Lopez* and a constitutional reading of *Scarborough. See Alderman v. United States*, 562 U.S. 1163, 1166 (2011) (Thomas, J., dissenting from denial of certiorari); *United States v. Hill*, 927 F.3d 188, 215 n. 10 (4th Cir. 2019) (Agee, J., dissenting); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting in part). Indeed, if *Scarborough* is a constitutional decision, then it grants the federal government unlimited power to regulate the affairs of citizens. *See Alderman*, 562 U.S. at 1167 (Thomas, J., dissenting from denial of certiorari) ("[T]he lower courts' reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit on the commerce power."). Any physical object has almost certainly crossed a state line at some point in the past. To hold that this past travel grants Congress a perpetual right to regulate what someone does or does not do with that object is to eliminate any restrictions on Congress's power. *See*

55

*Nat'l Fed'n of Indep. Bus. v. Sebelius [NFIB]*, 567 U.S. 519, 557 (2012) ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.").

This unlimited power renders 18 U.S.C. § 922(g)(1) facially unconstitutional. In *NFIB*, Chief Justice Roberts noted that "[a]s expansive as our cases construing the scope of the commerce power have been, they all have one thing in common: They uniformly describe the power as reaching 'activity.'" 567 U.S. at 551 (emphasis added). He reasoned that this limitation of Commerce Clause power to "activities" is a "distinction between doing something and doing nothing [which] would not have been lost on the Framers, who were 'practical statesmen,' not metaphysical philosophers." *Id.* at 555 (quoting *Industrial Union Dept., AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 673 (1980) (Rehnquist, J., concurring in judgment)). Four other Justices echoed Chief Justice Roberts's sentiment regarding the Commerce Clause analysis, stating that Congress could only regulate "activity affecting commerce[.]" *NFIB*, 567 U.S. at 658 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting).

56

Here, 18 U.S.C. § 922(g)(1) does not require that Mr. Elliott's gun possession was an economic activity, and that ought to be fatal to his conviction. As explained by *NFIB*, the Commerce Clause permits Congress to regulate only activities, i.e., the active participation in a market. But § 922(g)(1) criminalizes all possession, without reference to economic activity. Accordingly, it sweeps too broadly.

Further, the statute does not require that Mr. Elliott be engaged in the relevant market at the time of the regulated conduct. Chief Justice Roberts also noted that Congress cannot regulate a person's activity under the Commerce Clause unless the person affected is "currently engaged" in the relevant market. *NFIB*, 567 U.S. at 556, 557. As an illustration, the Chief Justice provided the following example: "An individual who bought a car two years ago and may buy another in the future is not 'active in the car market' in any pertinent sense." *Id*. at 556. As such, *NFIB* overrules the long-standing notion that a firearm which has previously and remotely passed through interstate commerce should be considered to affect commerce indefinitely without "concern for when the [initial] nexus with commerce occurred." *Scarborough*, 431 U.S. at 577.

Mr. Elliott thus was convicted under § 922(g)(1) without evidence that he was "currently engaged" in the gun market at the time of his arrest, and without evidence showing how recently he came to possess the gun. So § 922(g)(1) fails to survive *NFIB*'s Commerce Clause analysis. The statute has been construed to require only that a firearm have traveled in interstate commerce at some previous time. *See Scarborough*, 431 U.S. at 575. If it cannot be construed to require commercial activity of some kind by the defendant—something more substantial than mere possession of an item that crossed state lines at some unknown point—it then contains no jurisdictional element sufficient to bring it within the terms of Congressional power. In the absence of such a jurisdictional element, the Supreme Court has found federal criminal statutes falling substantially outside the commerce power to be unconstitutional, without pausing to consider whether the particular conduct of the defendant might have affected commerce. *See Lopez*, 514 U.S. at 561; *United States v. Morrison*, 529 U.S. 598, 607 (2000). In other words, without such an element, comparable statutes have been found facially unconstitutional.

58

For these independent and foreclosed reasons, Mr. Elliott's § 922(g) conviction should be reversed.

## II. The district court erred in its application of U.S.S.G. § 2K2.1(b)(1)(B).

If this Court affirms Mr. Elliott's convictions, it should nonetheless vacate his sentences based on the district court's erroneous application of U.S.S.G. § 2K2.1(b)(1)(B) and defective underlying finding that Mr. Elliott's relevant conduct included possession of *eight to twenty-four* distinct firearms such that a four-point Guidelines enhancement should apply.

*A. Legal Framework and Standard of Review.*

The section 2K2.1(b)(1) enhancement applies a sliding-scale of enhancements "[i]f *the offense* involved" three or more firearms. If less than three firearms were involved in the offense, no enhancement applies. If three to seven were involved in the offense, a two-point enhancement applies. § 2K2.1(b)(1)(A). If the offense involved eight to twenty-four firearms, a harsher, four-point enhancement applies. § 2K2.1(b)(1)(B).

Under the Guidelines commentary, "offense means the offense of conviction and all relevant conduct under § 1B1.3." U.S.S.G. § 1B1.1 cmt.

n.1(I). Thus, to apply the lower, two-point enhancement, the district court needed to identify at least *three* distinct firearms that were possessed by Mr. Elliott, either during the March 17 offense itself or as relevant conduct to that offense. *See* § 2K2.1(b)(1)(A). To apply the larger, four-point enhancement, the district court was required to identify at least *eight* distinct firearms that were possessed by Mr. Elliott, either during the March 17 offense itself or as relevant conduct to that offense. § 2K2.1(b)(1)(B).

Relevant conduct includes activity that is "part of the same course of conduct or part of a common scheme or plan as the count of conviction." *United States v. Byrd*, 898 F.2d 450, 452 (5th Cir. 1990). "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same *course of conduct* if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." § 1B1.3 cmt. n.5(b)(ii). Courts are directed to consider factors such as "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.*

The government bears the burden of proving, by a preponderance of the evidence, that another offense constituted relevant conduct. *United States v. Moored*, 997 F.2d 139, 144 (6th Cir. 1993). When an error like this one is preserved, a district court's application of the Sentencing Guidelines is reviewed de novo, and its findings of fact are reviewed for clear error. *United States v. Stevenson*, 126 F.3d 662, 664 (5th Cir. 1997).

> *B. The district court erred in its findings as to both the number of firearms involved and when those firearms were actually possessed.*

Two fundamental defects infected the district court's ruling below—which was both incorrect on the law and clearly erroneous on the record evidence before it.

First, as the district court's explanation made clear, it legally erred by confusing the relevant inquiry and then clearly factually erred in its application of that inquiry to the evidence before it. Under § 2K2.1(b)(1), the relevant inquiry is *the number of distinct firearms* involved in an offense—not the *number of times a defendant has possessed firearms* in the time leading up to the offense of conviction. The government did not argue that each of the gun possessions evidenced by the admitted photographs involved *distinct* firearms on each occasion. Nonetheless,

61

without evidence, the district court simply added up the distinct *occasions* (i.e., days) during which Mr. Elliott appeared to posses a firearm—apparently coming to the conclusion that he had held a firearm twelve times in the past. Of course, that was not the question. And, yet, apprised of the error, the district court failed to correct course. Although apparently now aware that twelve could not be the correct number, the district court asserted that *five* firearms in the various photographs appeared "different" from one another, and then mechanically added that number to the unknown firearm used in the March 14 homicide and the two found in Mr. Elliott's vehicle—without finding that those three guns were distinct from the five in the photographs. ROA.737. Thus, the district court still did not reach eight.

But even if the district court had been right on the *numbers* (and it wasn't), the district court was clearly wrong on the *timing* of that conduct—central to its analysis. Indeed, the entire crux of the district court's conclusion was that all of those possessions occurred within a year of the instant offense, and therefore were sufficiently temporally proximate to include as relevant conduct. In doing making that finding, the district court indiscriminately relied on the initial dates listed in the

images' Metadata as highlighted by Agent Amacker. But the district court clearly missed the correction made by the government's witness on cross-examination: He did not know what those dates meant or whether they actually indicated when those photographs were taken. Thus, there was no reliable evidence upon which to make a finding as to the dates of the various firearm possessions depicted in the images—and certainly not reliable evidence upon which to conclude that those possessions all occurred within the year leading up to the offense of conviction. Indeed, since the district court could not reliably pinpoint dates for those possessions, it could not even conclude that they all followed Mr. Elliott's 2018 felony conviction and thus were unlawful.

Based on those fundamental defects alone, the district court's application of § 2K2.1(b)(1)(B) must be reversed.

C. *The district court erred in its findings that all past, wholly unrelated firearm possessions qualified as relevant conduct to the March 17 drug offense.*

Assuming this Court finds that the evidence reliably proved the number of firearms and dates of their possession, those possessions nonetheless should not be considered relevant conduct to the offense of conviction. Notably, Mr. Elliott was arrested on March 17 in the act of

63

distributing narcotics—during which he carried a firearm, according to the factual basis, "to protect the drugs he intended to sell." ROA.233. Beyond the mere involvement of a firearm, nothing about that conduct resembled or related to the March 14 homicide and, certainly, that conduct was not similar to Mr. Elliott posing in a photograph while holding a firearm.

Mr. Elliott recognizes that this Court has previously concluded that multiple firearm possessions in past cases were sufficiently similar to one another to be considered relevant conduct. *See, e.g., United States v. Brummett*, 355 F.3d 343, 345 (5th Cir. 2003). However, the evidence of "similarity" (or lack thereof) in this case was unique. The offense of conviction was a narcotics offense in which a defendant carried a firearm for protection. The separate "firearms" identified by the district court as relevant to that offense were mere possessed in various staged photographs found on Mr. Elliott's phone. Thus, the underlying *purpose* of the weapons' possession bore no resemblance to one another at all—they were simply not connected.

Accordingly, this Court should vacate Mr. Elliott's sentence.

64

## CONCLUSION

Wherefore, for the foregoing reasons and/or those reasons otherwise apparent to this Court, Appellant Burneal Elliott respectfully requests that this Court vacate his convictions and sentences.

Respectfully submitted,

s/Celia C. Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender

Office of the Federal Public Defender
Eastern District of Louisiana
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
Celia_Rhoads@fd.org

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 11, 2025, the foregoing Appellant's Brief was filed with the Clerk of Court via the electronic filing system, which will send an electronic Notice of Docket Activity to the following Filing Users:

Kevin G. Boitmann, kevin.boitmann@usdoj.gov, and
Megan Roberts, megan.roberts@usdoj.gov,
        Assistant United States Attorneys.

"The court's electronic Notice of Docket Activity constitutes service of the filed document on all Filing Users." 5TH CIR. R. 25.2.5.

s/Celia Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,301 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook, 14-point font for text and 12-point font for footnotes.

3. This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a)(5), 5th Cir. R. 25.2.13, and Fed. R. Crim. P. 49.1, because it has been redacted of personal data identifiers.

4. This electronic submission is an exact copy of the paper document, in compliance with 5th Cir. R. 25.2.1.

5. This brief is free of viruses because it has been scanned for viruses with the most recent version of Symantec Endpoint Protection, in compliance with 5th Cir. ECF Filing Standard A(6).

s/Celia Rhoads
CELIA C. RHOADS
Assistant Federal Public Defender
Dated: July 11, 2025